**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3088-19

IN THE MATTER OF DARIUS
COLLINS, NORTHERN STATE
PRISON

_____

Submitted May 12, 2021 – Decided July 21, 2021

Before Judges Alvarez and Sumners.

On appeal from the New Jersey Civil Service Commission, Docket No. 2019-3353.

Cammarata, Nulty & Garrigan, LLC, attorneys for appellant Darius Collins (John P. Nulty, Jr., on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent New Jersey Department of Corrections (Sookie Bae-Park, Assistant Attorney General, of counsel; Jana R. DiCosmo, Deputy Attorney General, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent New Jersey Civil Service Commission (Pamela N. Ullman, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Darius Collins, a former senior corrections officer assigned to Northern State Prison, appeals his May 8, 2019 termination from employment. We affirm.

By way of final notice of disciplinary action, Collins was found to have committed several violations of the New Jersey Administrative Code, including conduct unbecoming a public employee, neglect of duty, and falsification. See N.J.A.C. 4A:2-2.3(a)(6), (7), (12), Off. of Hum. Res., N.J. Dep't of Corr., Hum. Res. Bull. 84-17 C.8, C.11, D.1, D.7, and E.1 (1999). He appealed the removal to the Civil Service Commission, which transferred the matter for a hearing as a contested case to the Office of Administrative Law. See N.J.S.A. 52:14B-9.1 to -10.

At the administrative law hearing, the New Jersey Department of Corrections (DOC) presented investigating officers as witnesses, and their reports as supporting evidence. The triggering incident occurred on January 6, 2019, when Collins was the patrolling supervisor of prisoners housed in the Administrative Close Supervision Unit (ACSU), described by one of the investigators as a "jail for people who are already in jail." Collins had worked as a corrections officer for over two years and had no prior disciplinary history.

The chain of events that Collins was charged with causing involved two inmates taking unauthorized showers, and being able to move from one tier

within the prison to another because gates were left open. They claimed that after their showers, for which Collins wrongfully denied authorization, they returned to their cells only to find the contents had been destroyed. The prisoners were seriously injured "while resisting a ten-man team performing a 'two tier extraction' to get the two inmates under control."

The administrative law judge (ALJ) who heard the matter said he was troubled by the DOC's presentation because, despite having recorded interviews with Collins, the two prisoners directly involved and at least one other prisoner, they merely presented the investigator's testimony and reports.

The DOC requested an adverse inference based on Collins's refusal to testify. The ALJ agreed it would have otherwise been appropriate, but since no effort was made by the DOC to compel his testimony or offer his video-recorded interview, the ALJ could

> only find that with an adverse inference, the evidence is closer to being in equipoise than it would be without it given the lack of direct and reliable evidence that Collins committed what would be an incredibly stupid and meaningless act of wrecking the prisoner's cell, nor was anything stated or even implied about Collins from any reliable source (or unreliable one for that matter) that he has the character (or lack thereof) to commit such an offense. By the respondent's own evidence, prisons are indeed a powder keg[:] easily set to explode without much or any warning. By a preponderance of the evidence[,] I CANNOT FIND that Collins ignited

3

it. Nor did he make any material misstatement of fact about the incident or his conduct during it.

The ALJ therefore concluded that the only charge the DOC proved was neglect of duty. He explained that Collins

> readily admitted it was his duty to see that the gate that blocked access between the tiers was left secured and that he failed to do so. As described by the [DOC], this made this area of a high security part of the prison more dangerous. In this event, where a team of ten men were used for the "double tier extraction" made necessary by the recalcitrant inmates, the area of conflict was more likely to result in harm to the guards and prisoners because they were engaged on stairs in addition to the level floors.

Because there was no evidence that the two-tier extraction "resulted in . . . greater injury to persons or property because the gate was left open," the ALJ concluded that although clearly an act of neglect of duty, N.J.A.C. 4A:2-2.3(a)(7), had been committed, none of the other offenses withstood the hearing. Applying principles of progressive discipline, the judge concluded that the incident likely would have occurred despite the gate being unsecured. Collins admitted, to his credit, that he left the gate open. Acknowledging the need for a "heavy penalty," since the only charge proven by a preponderance of the evidence was neglect of duty, he imposed a term of 120 days' suspension and reversed the removal order.

4

Although agreeing with the ALJ regarding the charges, the Commission disagreed insofar as the penalty.  Observing that the theory of progressive discipline is inapplicable where the disciplinary infraction is quite serious, the Commission noted "that a [s]enior [c]orrectional [p]olice [o]fficer is a law enforcement officer who, by the very nature of his job duties, is held to a higher standard of conduct than other public employees."  The Commission went on to find that "leaving a gate open [was], essentially, failing to perform the fundamental duty of a [s]enior [c]orrectional [p]olice [o]fficer and [Collins's] failure to perform such duty demonstrate[d] egregious neglect.  Such an infraction compromised the safety and security of the facility and all of the employees and inmates therein."  That the event occurred in the ACSU made the infraction all the more troubling.  Collins offered no explanation for the "egregious lapse of duty."  In light of the nature of the conduct, the Commission reinstated termination as the sanction.  This appeal followed.

Collins asserts the Commission committed these errors:

> POINT I
>
> THE CIVIL SERVICE COMMISSION'S TERMINATION OF APPELLANT IS ARBITRARY, CAPRICIOUS OR UNREASONABLE AND CONTRARY TO THE CREDIBLE EVIDENCE IN THE RECORD.

A-3088-19

A.    The CSC's Findings Upon Which Appellant's Termination Was Based Are Contrary To The Record.

B.    The Penalty Of Removal Is So Disproportionate To The Offense As To Shock One's Sense Of Fairness.

It is black-letter law that an administrative decision, such as the imposition of a penalty for a disciplinary infraction, is reversed only where "arbitrary, capricious or unreasonable or . . . not supported by substantial credible in the record as a whole." Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980). We review such decisions according them a presumption of reasonableness when they address matters within the agency's field of expertise. Newark v. Nat. Res. Council, 82 N.J. 530, 540 (1980); In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993). We modify penalties only where "such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." In re Herrmann, 192 N.J. 19, 28-29 (2007).

In order for us to make that determination, it is apparent that the gravity of Collins's lack of care must be considered. Ordinarily, the assessment of the seriousness of disciplinary infractions "are matters peculiarly within the expertise of the corrections officials." Bowden v. Bayside State Prison (Dep't of Corr.), 268 N.J. Super. 301, 306 (App. Div. 1993). Collins is held to a higher standard given the nature of his employment.

6

In this case, the potential consequences were serious. Leaving an interior gate unlocked between two floors was indeed a failure "to perform the fundamental duty of a [s]enior [c]orrectional [p]olice [o]fficer" demonstrating "egregious neglect." Collins contends that any increase in danger from this act was merely theoretical and not specifically established in the record. However, there is some suggestion that an inmate's ability to transverse a greater geographical area during the course of this incident posed a greater danger to the inmates, prison guards, and the facility as a whole. That it was not a precipitating factor does not answer the question. Leaving a gate unlocked between floors in a prison is a very serious breach of basic protocol.

Certainly, Collins's singular act did not precipitate the conduct. Other than enabling at least some of what occurred during this incident, it did not cause any additional harm to inmates or guards. That does not address the fact that no explanation is offered, nor can one be given, for the neglect to fulfill that basic duty.

Progressive discipline is a very important principle. It is not, however, an immutable mandate. Instead, it is factored into the relevant standard. In this case, a corrections officer, without any explanation, while assigned to a unit housing inmates requiring the highest level of security in the facility, neglected

A-3088-19

a fundamental duty. Under this scenario, it does not violate principles of fundamental fairness to give little or no weight to the principle of progressive discipline. Collins's blameless prior history does not suffice to make the Commission's decision arbitrary, capricious, or unreasonable. The decision complied with the DOC's legislative mandate—that it preserve the safety of inmates, officers, and ultimately the public.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

8

A-3088-19